## ATTACHMENT A
## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, these Offices would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

1. **Bribery Conspiracy (18 U.S.C. §§ 371, 201) – Christopher BRACKINS**

   Beginning in or about late 2018 and continuing until in or about late 2021, the Defendant, **LENNIE LAMONT MILLER, SR.**, knowingly and willfully conspired and entered into an agreement with Christopher BRACKINS to corruptly demand, seek, receive, accept, and agree to receive or accept anything of value personally or for any other person or entity, in return for being influenced in the performance of any "official act," as defined in 18 U.S.C. § 201(a)(3), and committed at least one overt act in furtherance of the conspiracy.

   BRACKINS formed Company A in or about the mid-to-late 1990s to perform general construction work. BRACKINS is the sole owner of Company A. At all relevant times, **MILLER** was a contracting officer's representative employed by the General Services Administration (GSA), a U.S. government agency. **MILLER** served in a sensitive position and exercised substantial influence over GSA's decision-making process involving projects he supervised under contracts for which he was serving as the contracting officer's representative. **MILLER** first met BRACKINS in or about 2007 or 2008 when BRACKINS was looking for federal contract work for Company A.

   Between in or about 2018 and in or about 2021, Company A performed subcontracting work on certain GSA federal projects under prime contractor Company B and prime contractor Company C. Some of these GSA contracts were overseen on a day-to-day basis by **MILLER**.

   *MILLER Begins Soliciting Money from BRACKINS*

   Between in or about 2018 and 2021, **MILLER** operated out of a temporary GSA office space at the GSA St. Elizabeths West Campus ("St. Elizabeths Campus"), located in southeast Washington, D.C. There were several prime contractors working at the St. Elizabeths Campus, including Company B.

   In or about late 2018, **MILLER** was overseeing a project to repair the roof of the Douglas A. Munro Building at the St. Elizabeths Campus for which Company B was serving as a prime contractor and Company A was serving as a subcontractor. Near the end of the completion of the project, **MILLER** asked BRACKINS for $8,000 in cash for **MILLER**'s assistance in securing Company A's subcontract with prime contractor Company B. BRACKINS agreed to pay the funds to **MILLER**. Accordingly, in or about November 2018, BRACKINS provided funds to one of BRACKINS's employees and directed the employee to pay **MILLER** approximately $8,000 in cash.

1

In or about January 2019, **MILLER** once again solicited a payment from BRACKINS while BRACKINS was working on the Munro Building project at the St. Elizabeths Campus. On or about January 17, 2019, BRACKINS paid **MILLER** with a $3,800 check from Company A's account, issued with the memo line "Chevy 2500 HD," even though BRACKINS did not engage in any transaction with **MILLER** involving a vehicle of that make and model. On or about January 29, 2019, **MILLER** certified that the roof repair project at the Munro Building had been completed, a prerequisite to GSA's subsequent release of payment to Company B (which, in turn, paid Company A).

*2020 and 2021: The Atkins Hall Building Project*

In or about mid-2020, **MILLER** invited BRACKINS to inspect a building on the St. Elizabeths Campus called the Atkins Hall Building (also referred to as Building 31). The building required mold remediation and certain general repair work.

BRACKINS offered some guidance to **MILLER** on the scope of work that would be necessary to remediate the Atkins Hall Building. BRACKINS provided an estimate of his costs, including profit and overhead. **MILLER** suggested adding a 10 percent "contingency," which was abnormal for GSA projects.

Ultimately, Company C bid on the project, secured a contract for approximately $800,000, and subcontracted much of the work to Company A.

Before and while BRACKINS and Company A were working on the Atkins Hall Building remediation project in late 2020 and early 2021, **MILLER** solicited, demanded, and accepted payments from BRACKINS, including but not limited to:

1. In or about December 2020, BRACKINS, through a relative, paid approximately $3,100 to a Maryland-based vehicle repair shop for repairs to a vehicle owned by **MILLER**.

2. In or about January 2021, BRACKINS paid a contractor approximately $8,000 for repairs performed at a residence owned by **MILLER**'s relative.

3. In or about February and March 2021, BRACKINS paid $25,000 to **MILLER** using an intermediary, an individual with a long-standing relationship to **MILLER**. **MILLER** solicited the intermediary to accept the payments, through the intermediary's air conditioning repair business, on **MILLER**'s behalf. BRACKINS paid the intermediary's business $25,000 in three separate credit card payments. The intermediary's business in turn almost immediately remitted the funds in their entirety to **MILLER**.

During an interview with federal investigators in April 2025, **MILLER** falsely informed investigators that BRACKINS had not provided him with a $25,000 kickback.

BRACKINS provided these things of value to **MILLER** in exchange for **MILLER**'s official action in directing GSA federal project work to Company A by causing GSA federal

2

project work to be subcontracted to Company A. **MILLER** caused BRACKINS to believe that he would withhold federal project work from Company A if BRACKINS did not make the payments.

In total, BRACKINS provided approximately $50,000 worth of money and things of value to **MILLER** in exchange for **MILLER**'s official action in directing GSA federal project work to Company A. BRACKINS's estimated total profit from the GSA federal project work he obtained from the bribery scheme was $133,413.20.

2.  **Bribery Conspiracy (18 U.S.C. §§ 371, 201) – James TILLMAN**

Beginning in early 2020 and continuing through at least mid-2021, the Defendant, **MILLER**, knowingly and willfully conspired, and entered into an agreement with James TILLMAN to corruptly demand, seek, receive, accept, and agree to receive or accept anything of value personally or for any other person or entity, in return for being influenced in the performance of any "official act," as defined in 18 U.S.C. § 201(a)(3), and committed at least one overt act in furtherance of the conspiracy.

In 2008, TILLMAN formed Company D to perform general construction work. TILLMAN is the sole owner of Company D. TILLMAN first met **MILLER** in or about 2017 or 2018 when TILLMAN was looking for federal contract work for Company D.

In or about late 2018, **MILLER** directed a GSA contract to Company D for the renovation of a federal building. **MILLER** explained to TILLMAN, who had not previously obtained a federal contract, how to complete the requisite paperwork. At the time, TILLMAN suggested his proposed price for the renovation to **MILLER**, but **MILLER** suggested TILLMAN raise the price.

*2020: The Window Film Project and the First Set of Kickbacks*

In or about 2020 and 2021, **MILLER** operated out of a GSA facility at the St. Elizabeths West Campus, located in Southeast D.C. There were several prime contractors working at the St. Elizabeths West Campus, including Company C (and its related entities, referred to here collectively as Company C). **MILLER** invited TILLMAN to work on some construction projects at the St. Elizabeths West Campus, but TILLMAN had no relationship with any of the prime contractors generally working at the site. **MILLER** offered to facilitate an introduction to Company C personnel and eventually introduced TILLMAN to one of Company C's supervisors. Company C ultimately agreed to engage TILLMAN's company, Company D, as a sub-contractor on at least some construction projects.

In or about early 2020, **MILLER** began seeking a contractor who could place privacy film on certain interior office windows in a building on the St. Elizabeths West Campus. In or about April 2020, a Company C affiliate provided a proposal for the work to GSA that contemplated subcontracting much of the work to Company D. Company C's total bid for the window film project was for $86,858 (of which $29,498 was allocated to Company C as prime contractor for project management, overhead, profit, and bonding and $57,360 was allocated to Company D as subcontractor). TILLMAN had previously informed **MILLER** that he could complete the job for far less than $57,360 (including Company D's profit), but **MILLER** told TILLMAN to

3

substantially inflate his estimated costs.

GSA accepted prime contractor Company C's proposal. Between in or about April 2020 and in or about June 2020, Company D in fact completed the window film project with the assistance of another subcontractor. While the window film project was underway, **MILLER** informed TILLMAN about a future potential project involving the remediation of sinkholes at the St. Elizabeths West Campus.

Before and during this period, **MILLER** solicited and accepted numerous things of value from TILLMAN, including:

1. Before the window film project began, at a time when **MILLER** was suggesting to TILLMAN that **MILLER** was planning to direct GSA subcontracting work toward TILLMAN and Company D, **MILLER** solicited a total of approximately $8,000 in cash from TILLMAN on different occasions, which TILLMAN paid.

2. In or about mid-2020, **MILLER** solicited $10,000 in cash, which TILLMAN paid to **MILLER** in a parking lot in Clinton, Maryland.

3. In or about May 2020, **MILLER** demanded that TILLMAN pay for the cost of moving **MILLER**'s romantic partner to a new residence. The moving costs were approximately $2,500.

4. In or about mid-2020, TILLMAN agreed to pay **MILLER**—who had repeatedly asked TILLMAN to direct construction work to **MILLER**'s private business—for work that **MILLER** and **MILLER**'s relative performed at TILLMAN's relative's residence. After the work was complete, in or about June 2020, TILLMAN wrote a $3,800 check on Company D's checking account to **MILLER**.

5. In or about 2020, TILLMAN agreed to provide **MILLER** with approximately $2,000 worth of seafood that TILLMAN had obtained at a discount.

TILLMAN provided these things of value to **MILLER** in exchange for **MILLER**'s role in directing GSA federal project work to Company D. TILLMAN's estimated profit in connection with the window film project was $11,872.

### *2021: The Sinkhole Project and the Second Set of Kickbacks*

In or about late 2020 and early 2021, **MILLER** was preparing for a GSA project involving the remediation of sinkholes at the St. Elizabeths West Campus, specifically at the intersection of Ash and Birch Streets. Although TILLMAN's company, Company D, had no experience remediating sinkholes, **MILLER** effectively paired Company C (the prime contractor) with Company D as a subcontractor to prepare a proposal for the work. In or about April 2021, Company C bid on the work for approximately $634,000, and GSA accepted the proposal.

During this period, **MILLER** informed TILLMAN that **MILLER** wanted TILLMAN to

4

purchase a vehicle for **MILLER** using the funds TILLMAN earned through Company D's work on the sinkhole project. Between in or about June 2021 and in or about August 2021, Company D performed much of the work remediating the sinkholes with the assistance of another subcontractor and collected hundreds of thousands of dollars from Company C in connection with the project. During and around this period, **MILLER** solicited and accepted numerous things of value from TILLMAN:

1. On or about July 6, 2021, **MILLER** certified the completion of a portion of the work on the St. Elizabeths sinkhole remediation project.

2. On or about July 16, 2021, GSA paid Company C approximately $276,000 for that work.

3. On or about July 21, 2021, Company C paid Company D $222,500, which was Company D's share of the GSA funds associated with this phase of the sinkhole remediation project.

4. In or about July 2021, **MILLER** selected a used sports car that **MILLER** then asked TILLMAN to purchase on **MILLER**'s behalf.

5. On or about July 22, 2021, **MILLER** texted TILLMAN the name of the owner of the sports car, told TILLMAN to make a check payable to the car's owner, and added "The [car emoji] 8500.00."

6. On or about July 23, 2021, TILLMAN wrote a check for $8,500 on Company D's checking account to the owner of the sports car.

7. On or about July 26, 2021, the car was registered under **MILLER**'s name in the state of Maryland.

8. In or about 2021, **MILLER** solicited approximately $25,000 in cash from TILLMAN, which TILLMAN paid.

TILLMAN's estimated profit in connection with the sink hole project was $97,780.

During an October 2021 interview with federal investigators, **MILLER** falsely denied that TILLMAN purchased him the sports car. **MILLER** informed agents that he had purchased the sports car himself, with cash.

In total, TILLMAN provided approximately $59,800 worth of money and things of value to **MILLER** in exchange for **MILLER**'s role in directing GSA federal project work to Company D. TILLMAN's estimated total profit from the GSA federal project work he obtained from the bribery scheme for both the window film and sink hole projects was $109,652.

SO STIPULATED:

By: _____
Joel Crespo
Assistant United States Attorney

By: _____
Edward P. Sullivan
Acting Chief, Public Integrity Section

_____
Lennie Lamont Miller, Sr.
Defendant

_____
Eric Pilch, Esq.
Counsel for Defendant